SO ORDERED.

DONE and SIGNED February 2, 2018.



_____
**JEFFREY P. NORMAN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Lillie Mae Banks | § | Case Number: 17-10456 |
| | § | |
| Debtor | § | Chapter 7 |

### MEMORANDUM OPINION

The Court held a hearing on the Acting United States Trustee's Motion to Disgorge Fees and for Other Appropriate Relief (ECF No. 16) in the above captioned bankruptcy proceeding on January 9, 2018. This opinion constitutes this Court's findings of fact and conclusions of law. To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

1

## STATEMENT OF JURISDICTION

The United States District Court for the Western District of Louisiana has issued a General Order of Reference of Bankruptcy Cases and Proceedings dated June 1, 2012. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). This United States Bankruptcy Court has the authority to issue final orders pursuant to 28 U.S.C. § 157(b). The Court also has inherent authority to "to discipline attorneys who appear before it." *Chambers v. NASCO Inc.*, 501 U.S. 32, 43 (1991). The Court's inherent authority is further bolstered by 11 U.S.C. § 105.

## FACTUAL AND PROCEDURAL BACKGROUND

This case is an unfortunate tale of attorney delay, promises to a client made by counsel but not kept, deception, and professional negligence. On December 29, 2015, the debtor, Lillie Mae Banks (hereinafter "Banks"), contacted UpRight Law LLC (hereinafter "UpRight") by telephone. After a series of calls this opinion discusses later, Banks ultimately retained UpRight on February 16, 2016, to file a Chapter 7 bankruptcy case. After unnecessary delay and several errors, UpRight finally filed a Chapter 7 for Banks on June 10, 2016, some four months later. This first bankruptcy case was dismissed on June 13, 2016, three days after it was filed, when UpRight failed to file Bank's credit counseling certificate. UpRight committed additional errors in attempting to reinstate[1] Banks' case, failing to properly file and prosecute said motion; therefore that case remained dismissed. Banks' second bankruptcy case (the instant case) was filed on March 28, 2017. Unfortunately, this case was subsequently dismissed on May 11, 2017, again due to UpRight's negligent failure to file required documents.[2] Thereafter, UpRight did not seek to

---

[1] The Court treats a Motion to Reinstate as a Motion to Vacate the Dismissal Order. Technically, there is no such motion as a Motion to Reinstate a dismissed bankruptcy case.
[2] The case was dismissed *sua sponte* for failure to comply with 11 U.S.C. § 521.

2

vacate the dismissal order, which it easily could have done. But for the actions of the United States Trustee (hereinafter "UST"), the debtor would have been on her own to deal with the legal mess and entanglements created by UpRight. On May 18, 2016, the UST sought to vacate the dismissal order in this case, which the Court granted. The UST then filed a Motion to Disgorge Fees and for Other Appropriate Relief. The Court's findings of fact derive from the hearing conducted on the UST's motion, which was held on January 9, 2018.

## FINDINGS OF FACT

By stipulation, the parties introduced 38 exhibits into evidence. Some of these exhibits consist of telephone transcripts, emails, and text messages. These exhibits, together with witness testimony, give a clear picture of the interactions between UpRight and Banks. The Court will provide a chronological review of the events in this case.

On December 29, 2015, after discovering UpRight on the internet, Banks called UpRight for the first time. First, Banks spoke to an employee named David, who placed notes from their conversation into UpRight's computer system. David ultimately routed her to Brian, who is described as a "senior consultant" and is not an attorney. Banks disclosed she had between $15,000 and $18,000 in debt that she could not pay. She told Brian her problems stemmed from a broken $10,000 heating and air conditioning system that Sears refused to fix. She indicated that, given her fixed income, she could not afford to pay Sears. The Court considers Brian a salesperson, as it is obvious he was following a sales script. He made the following promises in this initial conversation, nearly all of which turned out to be false:

a. He indicated he would set Banks up on a payment plan to pay for her bankruptcy.

b.  He stated he would provide her a number for the immediate referral of creditor calls. He promised creditors would be sued if they continued to call.  The following is a direct quote from David during the call:

> "I mean, because what I would do is I'd get you the number that you can start referring your creditor calls to us, and basically what you're going to tell them is say, look, I've retained a law firm that's handling my finances.  Here's the number and don't call me again. And if they do call you up, you let us know.  We'll go after them, we'll sue them, and whatever funds we collect we put back into your pocket as well, so I mean, it's a win win situation.  That way…if they do contact you, again we'll go after them and…we'll make sure that, you know, we collect the funds and then we'll put those funds back into your pocket as well.  So that's…what we'd be able to do for you, and you know, the relief would – **it would definitely be able to start today** as opposed to, you know, at some other time as well [emphasis supplied]."  UST Ex. 1, pgs. 7-8.

c.  He promised Banks that her bankruptcy would only take a couple of months.  The Court notes that Banks' bankruptcy has not concluded as of this date, which is more than two years after this promise was made.

d.  He promised her "[t]his will be a very simple case."  The Court agrees that this should have been a simple bankruptcy case.  However, this is "the rest of the story,"[3] as UpRight failed to represent Banks adequately in the case.

e.  He quoted Banks a fee of $1,685.00 for filing her Chapter 7, which covers filing fees, court costs and all attorney's fees.

f.  He represented that UpRight is one of "the biggest and best bankruptcy law firms in the country."

g.  He indicated UpRight is a nationwide law firm that delivers services seamlessly to clients regardless of the location using the internet, email, and telephone.  He stated this UpRight provided these services as a convenience to clients  The Court notes UpRight's

---

[3] The "rest of the story" is a quote from a radio program hosted by Paul Harvey. The broadcasts always concluded with the tag line "and now you know the rest of the story."

4

legal services were not seamless with respect to Banks, and that the internet, email, and telephone options appear to mainly benefit UpRight itself.

h. Brian promised Banks would be represented by a local lawyer and that she could travel to that lawyer's office if she desired. As discussed later, Banks was not appointed a local lawyer. Instead, UpRight appointed a lawyer located 350 miles from Banks' home.

i. Brian concluded by stating that Banks was "all set" and that "the attorneys will be reaching out to you very soon." The Court notes that Banks' local attorney waited almost 45 days to contact her after this conversation. At the end of this initial conversation, Brian read a scripted disclaimer. This disclaimer expressly contradicted some of the promises Brian had just made to Banks. The disclaimer stated the following, in part:

> 1. "Our firm does not offer services for non-bankruptcy alternatives." Brian had offered to sue Banks' creditors if they call her. This promise is a reference to the Fair Debt Collection Practice Act.[4] However, if UpRight does not offer these services, why were they offered as an inducement to get Banks to retain the firm for a bankruptcy?

> 2. "You acknowledge that you've asked – that the firm does not represent you until you talk to your local attorney." Brian had promised immediate relief, yet the disclaimer indicated that relief would not be immediate. In fact, Banks did not speak to her "local" attorney for almost 45 days after this conversation.

> 3. "You understand and accept for your video conference you will not meet face to face with your attorney at your hearing date unless you want to travel to their

---

[4] The Fair Debt Collection Practice Act (FDCPA) 15 U.S.C. § 1692. Aggrieved consumers may also file a private lawsuit in a state or federal court to collect damages (actual, statutory, attorney's fees, and court costs) from third-party debt collectors.

office."  This disclaimer is confusing.  Typically, the only "hearing" in a no-asset Chapter 7 case is the § 341 first meeting of creditors.  In this division, this meeting occurs at the courthouse and the attorney would not participate by video conference.  Perhaps Brian was indicating that future attorney client meetings would be conducted by video conference.  However, this disclaimer contradicts Brian's earlier promise that Banks could meet with the local attorney at the attorney's office.

Banks received another telephone call from UpRight the same day (December 29, 2015).  This time she spoke to an individual named Josh Laker, who identified himself as an attorney with UpRight.  Mr. Laker is an attorney admitted to the Illinois State Bar on November 5, 2015, and who lists his registered business address at UpRight Law at 79 W. Monroe St., Chicago, IL 60603-4901.  Mr. Laker is based in Chicago, and is not licensed to practice law in Louisiana.  He advised Banks that she would be getting a retainer agreement via email.  He also stated the following:

> "We are a virtual multijurisdictional law firm, so all that means is what lawyers and legal assistants in Louisiana and outside Louisiana helping you with your case, so while I'm in Chicago in our main office and, you know, we'll have a team here that will be helping you through the process and working on your case, you'll also have a local partner/attorney, and that's Ms. Cynthia Tanner,[5] and Ms. Tanner is going to be reaching out to you soon."  UST Ex. 2, pg. 6.

Cynthia Tannert electronically signed Banks' Attorney Client Base Retainer Agreement for Chapter 7 Bankruptcy Related Services (hereinafter the "retainer agreement") the next day.  Ms. Tannert is located in Greenville, Tennessee and is licensed to practice law in Tennessee and Georgia.  She has never been licensed to practice law in Louisiana.  Ms. Tannert never contacted Banks.  Further, Banks never received a retainer agreement signed by an attorney licensed in

---

[5] The Court notes that the individual mentioned here is named Cynthia Tannert, even though the transcript indicates her name is Cynthia Tanner.

Louisiana. Josh finished the call by giving Banks a number for creditor referrals and confirmed Banks' payment arrangement for her Chapter 7 bankruptcy.

Banks signed the retainer agreement for Chapter 7 Bankruptcy on December 30, 2015. Banks signed electronically using DocuSign. Cynthia Tannert's signature is affixed to the document using the /s/ notation, but she did not physically sign the retainer agreement or even see it. Tannert, a partner attorney with UpRight, has signed a contract giving UpRight permission to sign her name to these contracts without notice. The retainer agreement specifically provides that "[t]he undersigned Partner of Firm has authorized Firm to affix Partner's digital signature upon this Agreement."

The Court finds the retainer agreement problematic. Some of its terms violate the Louisiana Code of Professional Responsibility, specifically Rule 1.5. However, as Banks never received a signed copy of the agreement signed by an attorney licensed to practice law in Louisiana, the agreement is not binding. Still further, the retainer agreement contains terms that are contrary to the oral representations made by UpRight and contains "unbundling" provisions this Court has not and will not allow. [6] For example, UpRight had previously quoted Banks a onetime fee of $1,685.00 for filing her Chapter 7, which covered filing fees, court costs, and all attorney's fees. However, the retainer agreement signed by Banks allows for additional attorney fees for the negotiation, review, and execution of reaffirmation agreements with creditors. This Court does not allow such unbundling. In the Fifth Circuit, a debtor must reaffirm, redeem, or surrender all secured debts. *Johnson v. Sun Finance Co. (In re Johnson)*, 89 F.3d 249 (5th Cir.

---

[6] Unbundled legal services, also known as limited scope representation and discrete task representation, is a practice in bankruptcy cases in which an attorney attempts to limit the scope of the attorney's involvement in the case. This Court permits "unbundling" for legal services in Chapter 7 cases for adversary proceedings; however, it requires debtor's counsel must represent the debtor, without exception, for all legal services from case filing to discharge, **or** the date a discharge order would have been entered if a complaint under 11 U.S.C. § 727 is filed in the main bankruptcy case.

1996) (holding chapter 7 debtors cannot retain collateral securing their consumer debt without either redeeming the property or reaffirming the debt). If a debtor mistakenly does not reaffirm or redeem collateral, a debtor can be forced to surrender that collateral. Therefore, this Court considers reaffirmation or redemption an integral part of representation in a Chapter 7 case. An attorney cannot unbundle such services. Also, this Court will not allow UpRight's attempt to disclaim or resolve this issue by stating the following in its retainer agreement:

> In various jurisdictions, services for reaffirmation agreements may not be excluded in Firm's limited scope retainer agreement, in which case the Firm will waive the $150.00 fee.

Such language is confusing. It also contradicts to the oral representations UpRight made to Banks that all legal services are included in her quoted fee. Any future retainer agreements between UpRight and its clients in the Western District of Louisiana must specifically include all services integral to a Chapter 7 filing. It also must conform to the Louisiana Rules of Professional Conduct.

On January 5, 2016, Brian returned Banks' telephone call. She had called UpRight earlier and left a message. She was worried about UpRight's legal representation. Brian replied as follows:

> "Yeah, yeah, well, we're – we're definitely going to be working on your case as I mentioned to you last time, and, you know, we're definitely moving things forward in the right direction, so, I mean what you're going to be doing in the meantime is like I mentioned to you previously just refer your creditor calls to us, and – and, you know while you're paying off your bankruptcy. Certainly, you know, as I just mentioned to you last time, if you do have some funds due in tax season, which is right around now, you can certainly put that toward your bankruptcy and it will be – you'll pay if off that much more sooner, so--" UST Ex. 5, pgs. 3-4.

Banks was worried as she had been approached by one of her creditors. Brian responded as follows:

> "Yeah, you're –we're –we're moving forward with your – with your case. That – that's what we're doing, we're definitely going to be moving forward with – with getting you started with your bankruptcy. Absolutely." UST Ex. 5, pg. 4.

Banks was stalling because he was aware there really was no action taking place on Banks' case. UpRight was not going to file her case until she had paid the retainer. To his partial credit, he did effectively communicate to Banks that her case would not be filed until she finished what he called "a great payment plan." However, the Court is troubled by this conversation because it completely contradicted his prior promise that relief would be immediate.

No later than January 18, 2016, UpRight's partner attorney Andrea Augustus[7] (hereinafter "Augustus") was aware that UpRight had assigned her Banks' Chapter 7 case. On that day, Augustus received an email from Joe Liang at UpRight regarding why she had not called or contacted Banks. He stated the following in that email:

> "Secondly, I wanted to see if there's anything I can do to assist with the 9 clients awaiting the first compliance call. Let me know if you are having difficulty getting ahold of them." Respondent Ex. 3.

Banks was one of the nine clients she had not contacted. Augustus responded two days later, on January 20, 2018. She apologized and stated that she would be emailing those nine clients, including Banks, later that day.

On February 1, 2016, some 12 days later, Banks calls UpRight. She was concerned that her local lawyer had not contacted her. Banks was apparently aware that Augusts was her local attorney, but the record is unclear about how she knew this. Banks spoke with an individual at UpRight named Sola, who was not an attorney. Banks indicated she was worried because Augustus lives in New Orleans and she wanted to get a Chapter 7 hearing date. She was advised that her Court date would be about three weeks after she filed her bankruptcy case. Sola also stated that Banks' case had not been filed yet due to her not having paid her retainer. Banks was worried

---

[7] As of June 1, 2017, Ms. Augustus was ineligible to practice law in Louisiana for failure to fulfill continuing legal education requirements and failure to pay bar dues. She has since restored her eligibility.

she would have to go to court in New Orleans, but Sola advised her that she would go to court in her county.[8]  Banks stated "I'm just trying to get my mind settled."  She indicated she wanted to pay her fees off early so that her case could be filed.  Sola advised that she could pay off her case in full and her bankruptcy case would be filed.

On February 10, 2016, Augustus emailed Banks.  This email was brief and merely contained documents Augustus was requesting Banks complete.  Respondent Ex. 4.  Before this email, it had been 43 days since Banks initially contacted UpRight.  This email was the first time she had been contacted by a lawyer licensed to practice law in Louisiana and admitted to practice in the Western District of Louisiana federal courts.  Any legal advice given to Banks from December 29, 2015, to February 10, 2016, had been given by staff of UpRight or by an UpRight lawyer not licensed in Louisiana.  This Court has concerns about the unauthorized practice of law during this substantial period of time.

On February 16, 2016, Banks called UpRight.  She indicated she had been unable to get in touch with Augustus.  She was confused and believed that Augustus was a paralegal.  She stated:

> "Banks: My name is Lillie Banks, and I've been trying to get in touch with the paralegal that they assigned me to which is Andrea Augustus."
> UpRight: OK
> Banks: I'd like to be able to reach anyone at that number.
> UpRight: What number do you have for her?
> Banks: (504) 264-1167
> UpRight: Oh, okay. Do you leave messages for her when you call?
> Banks: Yes, I have left several messages and I haven't had a return call."  UST Ex. 7, pg. 2.

By this point, Banks had received certified letters from a creditor.  She had yet to speak to Augustus or any attorney licensed in Louisiana, and had only received a brief email from Augustus.  UpRight

---

[8] The Court notes that Louisiana does not have counties, but rather parishes.

advised Banks again to give creditors UpRight's contact information. UpRight further advised

Banks to complete her documents so that she could file bankruptcy.

UpRight attempted to call Augustus on another line, but they only reached Augustus's

voice mail. UpRight left the following message on Augustus's voicemail:

> "Hi, message for Attorney Augustus: This is Scott calling from UpRight Law. I
> have a client that's been trying to reach you. She got your email address to
> documents and information you're going to need from her. Has a few questions.
> Client's name is Lillie Banks, B-A-N-K-S. She's out of Homer, Louisiana" UST
> Ex. 7, pg. 6.

Banks was still worried about Augustus's location. UpRight attempted to allay Banks' fears.

UpRight stated the following:

> "So the nice thing is that if her office is too far away from you, she travels to you
> for the only thing you actually need to appear for which is the 341 meeting with the
> trustee after you're filed. If her office is too far away, at the time of the review
> you'd do it as a video conference call via Skype or Facetime. We have these options
> too. So her location shouldn't be an issue. We do want to get you at least with
> somebody who covers that district." UST Ex. 7, pg. 8.

It is clear UpRight had little or no knowledge that its partner attorney (Augustus) and the client

(Banks) are 350 miles apart, which would be a 12 hour round trip by car. Given the distance

between them, Banks never personally met with Augustus, nor anyone from UpRight. Banks

expressed concern that her Chapter 7 payment plan would not end until April, but she wanted to

pay it off early and get her case filed. In response, UpRight stated the following:

> "Yeah, take care of the fees quicker, get those types of judgments or those letters
> that the courts are sending you, take care of those, absolutely, yeah, just give us a
> call here. We can schedule payments ahead of time and run those while we have
> you on the line. UST Ex. 7, pg. 10.

That same day Banks finished her bankruptcy payment plan earlier than scheduled. UpRight then

provided Augustus a paid in full summary via email showing Banks' legal fees had been fully

paid.

Later that same day, February 16, 2016, Banks again called UpRight.  She spoke to Josh, who confirmed she had paid her case in full.  He stated the following: "[w]hat I'm going to do for you today is start prepping your petition which is what gets filed with the bankruptcy court."  UST Ex. 8, pg. 2.  This is contrary to Augustus's testimony.  She testified she alone was responsible for the typing and filing of Banks' petition.  Banks had yet to speak to Augustus or any other lawyer licensed in Louisiana and had borrowed money from a family member to pay the bankruptcy legal fees in full.  Josh promised Banks "[s]o you're going to be filed relatively soon here." However, the case would be unnecessarily delayed, and would not be filed for nearly another four months.

On February 19, 2016, Banks spoke to Augustus for the first time.  This was the first time she had spoken to a lawyer licensed in Louisiana.  Any legal services provided by UpRight to this date had come from UpRight's staff.  The attorneys she had spoken to were located in Chicago, and those attorneys were not licensed to practice law in Louisiana.  That same day, Augustus emailed Banks a bankruptcy document request letter.  On March 4, 2016, Banks completed her credit counseling and forwarded the certificate to Augustus.  Augustus's negligent failure to timely file this document caused the dismissal of Banks' first bankruptcy case.

On March 17, 2016, Banks called UpRight to indicate she was still having difficulty reaching Augusts.  The following day, she called UpRight once again.  In that call, she stated the following:

> Banks: I'm having a hard time trying to catch up with (incomprehensible) lady that's been assigned to me in my area.
> UpRight:  Yeah, Ms. Banks, I see you called in yesterday morning about it.  When you called the number, you were unable to reach her?
> Banks: Well, I called yesterday and say I'll call you this time, and I still can't never get her.  UST Ex. 11, pg. 2.

The UpRight representative then promised to get managers involved and assured Banks that Augustus or someone else would get in touch with her soon. The representative ended the conversation by saying the following:

> UpRight: Yeah, but you understand that we're legit, because obviously if we weren't, we wouldn't have taken you out with the payment that you agreed to. We would have probably like emptied your bank account and disappeared in the night. I mean, we're here to help you, and we still want to file your Chapter 7. I can't speak for why Attorney Augustus is not returning your calls, but what I can do is get my managers involved so we can fix that. UST Ex. 11, pg. 4.

Despite UpRight's continued promises, there was an amazing lack of oversight of August by UpRight. Scott Hogan, who holds the title of Client Advocate with UpRight, sent an internal email to a Joe Liange that same day (March 18, 2019) stating the following:

> "Ms. Banks called in yesterday and not being able to reach the PA.[9] She has left VM's and gotten no calls. Crystal called yesterday too and left a message. Told Ms. Banks I'd get you involved since she can't get an answer." Respondents Ex. 7.

Joe Liange forwarded the email to Augustus and asked her to "[p]lease reach out to the below referenced claim before the end of the day." Augustus responded by stating the following:

> "I've spoken to Ms. Banks on several occasions and sent an email. However, I will contact her today. I believe clients are unfamiliar with my voicemail and hand up when it asks their name." *Id.*

Her response was forwarded to Scott Hogan, who took no further action.

Irrespective of Augustus's assurances, Banks called six days later UpRight on March 24, 2016. She had been served a civil citation and was very upset. She did not feel like anything was being done on her case. She stated the following:

> "Because I don't feel like anything is being done. I have paid my money, and I just got issued a civil citation due March (incomprehensible) in my house in (incomprehensible) by creditors, and y'all had told me not to pay anything, stop paying everybody, so I did that, but now I'm being sued, and I have ten days with this – all these papers they just sent me." UST. Ex. 12, pg. 2.

---

[9] This appears to be an abbreviation for "Partner Attorney."

UpRight responded that they needed more documents from Banks.  She responded that she could not reach her attorney.  She stated the following:

> Banks: I called her. I talked to her (incomprehensible) and she told me – and said they need some more information on the stuff that she says she didn't receive from me, so I've been checking my e-mail, and I haven't received anything (incomprehensible).
> UpRight:  Have – have you tried to contact her today just to see if she sent it.
> Banks: I just tried and I told you I never can get her on this number that she gave me.  UST Ex. 12, pg. 2-3.

That same day, Banks emailed Augustus and stated in all caps "DID YOU RECEIVE MY E-MAIL?  PLEASE CALL ME AT YOUR EARLIEST."  Augustus did not call Banks, but instead emailed a reply of "[n]o ma'am I haven't seen an email from you.  I'll contact you as soon as I am able."  UST Ex. 13.  In response, Banks emailed Augustus from an email address not associated with her and carbon copied herself.  This email contained a copy of the civil citation the sheriff's department had issued that morning.  Banks also gave Augustus two phone numbers to reach her.

Four days later, on March 28, 2016, Augustus emailed Banks with a request for updated documents.  One day later, she provided a fax number so that Banks could forward the documents.  Apparently, the notice of a civil citation had still not caused Augustus to take more immediate action and it would still be over two months before she would file Banks' first Chapter 7 case.

On April 10, 2017, Banks again emailed Augustus in all caps.  That email stated the following:

> "ANDREA WILL YOU PLEASE GIVE ME CHECK UP CALL SO I WILL KNOW IF I HAVE EVERYTHING BEFORE COURT DAY, IF YOU ARE NOT HANDLING MY CASE PLEASE LET ME KNOW.  THANKS FOR EVERYTHING YOU HAVE DONE IN THIS MATTER."  UST Ex. 14.

The next day, April 11, 2016, Augustus sent Banks an updated list of items required to be submitted before the case could be filed.  The following day, Banks faxed over 64 pages of documents to

Augustus. One day later, on April 13, 2016, a judgment is taken against Banks by Republic

Finance for $2,133.71 plus interest accruing at the rate of 18%, together with attorney fees at 25%.

On April 15, 2016, Banks sent a text message to Augustus asking if she had received the

64 pages faxed to her. Augustus did not respond. That same day, she called UpRight yet again.

She was angry about the judgment. She stated that "she has done what they asked me" and "today

I was – I have been issued a judgment against one of my creditors that I have because there was

no response." She continues:

> "I've been in touch with her (Augustus), and I have sent her all kind of information.
> I gave her information about when they first sent me a letter from the – the sheriff's
> department came by her, and they issued them a letter from the – from the creditors
> that I owe. I told her about this. They gave me ten days. And I gave her that
> information, and nothing has been done, no response. They haven't contacted
> them, I guess, or whatever because the people kept calling me and say I was lying
> that I had bankruptcy, and – because I don't' have a court number so today I get a
> notice of judgment, and…" UST Ex. 16, pgs. 3-4.

At this point, UpRight cut Banks off and told her she needed to provide more documents to

Augustus. In response, Ms. Banks stated the following:

> "Banks: She got everything. I have – as she explained what she need, I get it right
> back to her, so she got everything, and she's sitting there e-mailing to me she had
> received all my documents, so she got it. Now my, (incomprehensible) when I first
> filed, this guy name – well, I forgetted his name. Anyway, he tells me he's
> (incomprehensible) UpRight Law (Incomprehensible). He was the one advised me
> not to pay anything else on the bills –
> UpRight: Right, no, I get that –
> Banks: -- and just give them this 1-800 number –
> UpRight:-- I totally get that and –
> Ms. Banks: -- to call –
> UpRight: -- and that's correct – that's correct, but –
> Banks: -- which I have, but –
> UpRight: That's correct, but the key is to get you filed as soon as possible.
> Banks: Yeah, but it been there since February, and I have to keep calling back and
> forth to you all, and then – you know, because sometime Andrea is so hard to get
> in touch with, you know, and then I have to call your office and say I cannot get
> her, but lately she has been responding to me, but I'm saying now that – now I got
> this judgment so if (incomprehensible) I don't see no need to (incomprehensible).
> Because this here will have added me that I got to pay this amount – I got to pay

two thousand something dollars in (incomprehensible), so I'm trying to see if what - - you know, why is my case taking so long." *Id*. at pgs. 5-6.

The conversation continues:

> "I say she have all the documents, and I have give her everything that she asked for. It burns me. She came back and said she needed some more, so I made sure I got everything that she asked for. I go my whole (incomprehensible). Everything that I gave her, I keep it with dates on it…and I feel like, you know, if – if she (incomprehensible) take the money and I'm telling her that these people here is pressuring me, that they putting up a judgment and stuff against me, that seems though that (incomprehensible) you could at least call the people and say, well, yes, okay (incomprehensible) or something to keep them from going to the four – I know they taken for action on me now. (incomprehensible) you know, (incomprehensible). So it's frustrating, because like I told her, I said, I'm on a fixed income. I can't afford to pay out of (incomprehensible). We're trying to hire a lawyer to help me out, but (incomprehensible) because my case not being handled." *Id*. at pgs. 6-8

The UpRight representative responded that "I'll call her and see what's going on, and then I'll have her to give you a call back, because we need to get your case filed." *Id*. at pgs. 8-9. It would still be another twenty days before any further action is taken on Banks' case.

On May 4, 2016, August emailed Banks a draft copy of her bankruptcy petition. Banks reviewed this petition, made corrections, and returned it to Augustus. Two weeks later, on May 18, 2016, Augustus forwarded a second draft of the petition, which Banks then corrected and returned. Thirteen days later, August sent Banks a tracking number for the package containing the bankruptcy petition that must be signed. Banks signed the petition and schedules and returned them to Augustus. Finally, Augustus filed Banks' first Chapter 7 bankruptcy (Case No. 16-10979). The case was filed 164 days after Banks originally contacted UpRight. The case was then dismissed three days later.

The docket in that first case reflects that the case was dismissed due to Banks' failure to comply with 11 U.S.C. § 109(h), which contains the credit counseling requirement. Augustus failed to file the credit counseling certificate Banks obtained on March 4, 2016, and that she had

previously received.  In response to the dismissal order, which Augustus received electronically, Augustus emailed Banks requesting another copy of the credit counseling certificate.  Her email stated the following:

> "I hope this finds you well.  If you would forward me the email with your credit counseling certificate it would be greatly appreciated.  I do recall you sending it, unfortunately my email account is bursting and cannot be located via a search."  Respondents Ex. 18.

She did not inform Banks that her case had been dismissed.  Banks complied and emailed the credit counseling certificate.  On June 22, 2016, Augustus filed the credit counseling certificate. She also filed the Declaration of Electronic Filing and an Ex-Parte Motion to Reconsider Dismissal.  The PDF attached to the Ex-Parte Motion to Reconsider was incomplete and the clerk's office instructed Augustus to refile it.  However, Augustus did not refile the document.  Augustus took no further action in the case, so the case remained dismissed and was subsequent closed in February of 2017.

Augustus was negligent in allowing Banks' case to be dismissed and remain dismissed. Augusts could have easily vacated the dismissal order had she properly served all parties and set the motion to vacate for hearing.  She negligently failed to take these actions.  UpRight is also negligent in failing to appropriately supervise Augustus.  UpRight's failure to supervise Augustus continued over the entire course of UpRight's representation of Banks.

On June 20, 2016, Banks called UpRight and spoke to an individual named Teeter.  Banks explained she had received a letter notifying her that her bankruptcy case had been dismissed.  The conversation proceeded as follows:

> Teeter: Here in that case do me a favor. Call Attorney Augustus.  Do you want me to give her – her phone number.
> Banks: I've done called her – I got her number, and I'm not pleased with the way that I – that the feedback that I am getting, because when I got this letter, I was very upset about it, and I've been texting her so she – and I would ask her was she trying

to reject my case and my phone call. She text back and just said, no. Ms. Banks, but I'am out of town. Okay, I'm having a issue. I have given you – this shouldn't have taken six months to file bankruptcy. It's been over six months. And then when I get this letter, then you can't even talk to me enough to say, okay Ms. Banks, that was a misprint or something. Let me know at least what is going on. UST Ex. 23, pgs. 4-5.

Teeter promised that Banks would get a call from someone named Orlando, who is a lawyer at UpRight.

That same day an individual named Matthew, not Orlando, called Banks. Matthew explained that he was an "enhanced service manager." The record is unclear whether Matthew is a lawyer. He was calling her because of her earlier telephone call and because her first Chapter 7 case had been dismissed. He did not know why the case has been dismissed, even though this information could easily be obtained from the Court's electronic docket. Banks, who was confused by the terminology, advised him the case was dismissed because a "cash (sic) certificate and debt repayment plan wasn't provided." She stated that she had taken the class but could take the second financial management class until her case was filed. She stated the following:

> "But, I had sent her everything she asked for. I had taken the class online, the counsel class for the certification right after – when I first filed and then I couldn't file – I couldn't take the next class until they gave me a court number." UST Ex. 22, pg. 3.

Banks complained that she did not understand why it had taken six months for her case to be filed and that "it shouldn't take that long to file bankruptcy." She wanted to know why her creditors were still calling her. Matthew advised her to give them her case number. Banks explained that she had not given her creditors her case number because her case had been dismissed. Banks was clearly frustrated, as was Matthew. The conversation continued:

> Banks: I feel like I may have lost $1,600.00 that I paid you all up front in February.
> I paid the $1600.00 in February, and here it is June.--
> Matthew: Correct.

> Banks: -- and I'm still having to pay for it to have me get through this in a painless
> manner, but I haven't had nothing but paid since I've been through this because I –
> Matthew: If – if you – if you have creditors calling you, you have to give them your
> case number and then they know to stop. *Id*. at pg. 7.

Matthew clearly was not taking into consideration the fact that Banks' case was dismissed.

Due to the dismissal of the case, the automatic stay[10] was no longer in effect. Therefore, Matthew's

advice had little value. The conversation continued:

> Banks: But how can I give them a case when I didn't have a case number?
> Matthew: You – I – I – I don't know why this is not making sense.
> Banks: I did not get some up until later –
> Matthew: Okay, you're – you're filed – you're filed on June 10. Okay?
> Matthew: So prior to June 10th there was no case number because your case was
> not filed up until June 10th. Now that June 10th came around, you have a case
> number, so anybody calling you cannot call you so – as long as you provide them
> this case number. *Id*. at pgs. 7-8.

The Court again stresses that Banks' bankruptcy case had been dismissed for seven days. Matthew

had no basis for stating that "anybody calling you cannot call you so – as long as you provide them

this case number." This representation was false as there was no automatic stay in effect. The

conversation continued:

> Matthew: Now, to keep your case going the way it needs to, it sounds like the
> certificate of completion for the debtor's education course would be needed on the
> court's end, so what we're going to have to have you do is contact Ms. Augustus,
> because on our end everything – everything's completed. *Id*.

Given Banks' repeated difficulty communicating with Augustus, Matthew's advice was

problematic. Further, by stating that everything on their end had been completed, Matthew

confirms this Court's suspicion that UpRight is merely a referral service. Banks responded as

follows:

---

[10] The automatic stay is an injunction that halts actions by creditors, with certain exceptions, to collect debts
from a debtor who has declared bankruptcy. Under Section 362 of the United States Bankruptcy Code, the
stay begins at the moment the bankruptcy petition is filed. In a Chapter 7, the stay terminates at dismissal,
when a case is closed, or the time a discharge is granted or denied.

19

> Banks: Okay, can you call (incomprehensible)? She's still not answering my phone calls. She not answering my text. *Id*.

Banks was clearly frustrated. She later asked if this was the first case Augustus had handled. Matthew responded as follows:

> Matthew: No, not at all. When – she's a partner of ours, okay, so she's not someone that we just say, hey you know, here's – here's someone that needs their bankruptcy filed. She's literally a partner of UpRight Law and a player of UpRight Law. Not, to become a partner of UpRight Law, we're not going to hire any Tom and Sally fresh out of law school. They have to be doing bankruptcy for a very long time. This is not her first case. If something is going to be dismissed, it's generally because, unfortunately, something was not submitted by the client, so it – it's not something on the attorney end that she might have done, as right now it sounds like there might be some sort of documentation missing. So again, you sent the documents directly to her office, not here, otherwise I would pull up everything, you – sent it to her office, so that – that's why I – I don't want to sound redundant, but we are going to have to have you speak with her, now if you can reach her yourself, I will even step in there and say, hey Andrea, please –
> Banks: Yeah, I want you to step in because she is not responding to me. UST Ex. 22, pgs. 11-12.

As previously stated, Banks' case was dismissed due to Augustus's failure to file the credit counseling certificate that Banks had previously provided. Banks is <u>not</u> at fault for the dismissal; however, Matthew ignorantly attempted to blame her for not providing documents. He then attempted to intimidate her regarding a refund of the fees she had paid. He stated:

> Matthew: And I'll – and I'll do that, because Lillie, on our end – on our end as far as, you now, refunds go, which is what I think you're about to (incomprehensible), the work's completed, like the case is filed, the attorney fees are done, credit counseling all that so we couldn't offer a refund. *Id*. at pg. 12.

First, the Court must comment on the ignorance of Matthew's comments. Banks' bankruptcy case had been dismissed—the work was far from complete. In fact, Banks' case is still not complete to date. Second, the retainer agreement signed by UpRight specifically provides a guaranteed refund policy, so Matthew's comments are totally without justification. The retainer agreement states the following:

20

> 5. Guarantee – Refund Policy. Firm offers a 100% Money Back Guarantee that if the courts do not accept your bankruptcy filing because of an error on our part**,** we will refund 100% of your money, including the filing fee.

UpRight had repeatedly promised Banks that it would take specific actions, and that she was protected from her creditors. UpRight had also enticed her with the full refund policy. UpRight had promised that Banks' case would be competently handled until discharge. As the Court will discuss, these misstatements and broken promises are not isolated incidents, and UpRight's negligent representation actually continued.

Matthew later agreed to step in and help Banks. He stated "I'll step in and help with that, I really will because I know you're going through a lot." *Id.* Unfortunately, there is no evidence that Matthew followed up on any of his promises. Banks' case remains dismissed, and it would take nine more months for her second case to be filed.

On the morning of June 20, 2016, Augustus emailed Banks with a draft motion to reconsider the dismissal of her first case. The record is unclear whether Banks received or read the email prior to her telephone calls to UpRight. This motion was filed in Case No. 16- 10979 (ECF No. 6), but it was filed incorrectly. The Clerk of the Court requested the motion be refiled; however, Augustus failed to ever refile the motion to reconsider.

On July 12, 2016, Augustus emailed Banks. She stated the following:

> "That letter is the result of our previous conversation. I have been in contact with the law clerk of the judge your case is in front of to resolve the issue." Respondents Ex. 21.

Augustus had not been in contact with the law clerk of this Court. This Court's Courtroom Procedures, which are available on the Court's website, specifically states that "[c]ontact with Judge Norman and his law clerks, other than by pleadings, is strictly prohibited. Letters and telephone calls to chambers are prohibited." Augustus intentionally misled her client.

On July 25, 2016, an individual named Julian at UpRight contacted Banks to advise her that there was a court date the following day that Augustus should be attending to reconsider the dismissal of her case. This statement was false as there was no hearing scheduled.

On August 18, 2016, Banks called UpRight once again. She wanted more information regarding the next step in her case. She assumed the dismissal of her case had been vacated. However, she was still having difficulty communicating with Augustus. She stated the following:

> Banks: Yeah, but – okay, what is my next step, because it been filed for I guess maybe a month or a couple of months, I can't ever get in touch with my lawyer. She's never returned my call.
> UpRight: You're – you're waiting – you're waiting on a discharge, so a discharge takes, excuse me, sixty to ninety days.
> Banks: Okay, so my question is can we open my case, because I never had dismissed my – they have dismissed my case at one time because something about Andrea (incomprehensible) or something.
> UpRight: Let's see.
> Banks : So I'm just on pins and needles, and I never – I can never get in touch with her any time. Her mailbox is full and can't accept message, and the last time I (incomprehensible) was someone from your office when they told me that you probably going to court the next day, and I haven't heard from her to know how the court date went. I've been texting her trying to find, and I still haven't got a response. Hello?
> UpRight: Give me one second.
> Banks: Okay, I thought you had hung up on me.
> UpRight: Everything looks fine from – from what happened in June so looks like you are waiting to be discharged.
> Banks: Okay, Is there any way you (incomprehensible) in touch with Andrea and have her just give me a call –
> UpRight: Yeah, I'll – I'll
> Banks: -- and let me know what's going on?
> UpRight: I'll call her and – and see if I can get in touch with her, and I'll shoot her over an e-mail. All right?
> Banks: Okay.
> UpRight: All right, have a good –
> Banks: Okay.
> UpRight: Have a good day.
> Banks: Thank you. UST Ex. 27, pgs. 2-4.

UpRight never followed up on this call, and Augustus never contacted Banks. Banks' bankruptcy case remained dismissed and no discharge would be forthcoming. Again, UpRight misrepresented the facts of Banks' case to her.

On October 4, 2016, Banks again called UpRight. She complained that she had filed bankruptcy, that her case was not yet closed, and that she was getting creditor correspondence. She was not aware that her case remained dismissed. Banks again complained that Augustus was unresponsive. UpRight promised to escalate her case to a manager. Banks replied that this had been promised before and that nothing had happened. UpRight promised the following:

> UpRight: Right, so they'll look into all that that they'll reach out to Ms. Augustus and get the details from her and then at that point we'll reach out to you. Hopefully Ms. Augustus will reach out to you and we can get this moving forward and any steps need to get this case filed and whatever else it needed at that point. UST Ex. 28, pg. 8.

On October 7, 2016, Banks again called UpRight. UpRight indicated that Augustus would call Banks that day. Banks was frustrated as she knew her case had been dismissed. UpRight advised that the matter had been escalated to partner relations and promised they would reach out to her with an update soon. However, as usual, UpRight never followed up. Again, the Court stresses the repeated broken promises made by UpRight to Banks and UpRight's continued failure to monitor and oversee its partner attorney Augustus.

On October 12, 2016, Banks again called UpRight. August had not called her, and no one from partner relations had called her. Banks expressed her frustration with the fact that no one would ever follow up with her. UpRight simply had no answer. A representative merely promised to get in touch with partner relations. In this conversation, Banks stated the following:

> Banks: You should at least give me someone that know how to handle the business. (Incomprehensible) I have to start back in – receiving letters from all these collection agent. You know, where is my money then, you know. They tell me they can't reimburse me my money but you haven't given – you haven't satisfied

me yet. So do I need to get a lawyer to make sure this company's legit, or what do I need to do? Because I'm tired – my – I don't feel like –
UpRight: No, the – the legitimacy is – isn't really the issue. Listen , I cannot argue that – that this is an issue Okay? Again, I wish I could give you an answer –
Banks: It's an issue of –
UpRight: What was that?
Banks: It's an issue to me because it's all have – almost a year. I haven't yet been (incomprehensible) before the judge or anything. You know, you – you've given me all these broken promises maybe about five or six months ago. Okay, two – two – it's been at least two months ago, and I – every time I call you, you never return my call, and they telling me that if I call, they are responsible to me within seventy-two hours. I never got a phone call yet. I always have to call this – I have to call my lawyer. My lawyer do not recall… UST Ex. 30, pgs. 5-6.

On October 13, 2016, Banks received an email from Augustus. UST Ex. 31. This was the first time in three months Augustus had followed up with Banks. Augustus indicated that she was preparing to file Banks' second bankruptcy case. However, Banks' credit counseling certificate had expired.[11] Therefore, Augustus advised Banks to retake the credit counseling course, which Banks does on October 17, 2016.

On October 19, 2016, August once again emailed Banks. Respondents Ex. 24. She states that she will print Banks' first bankruptcy petition to determine if there are any changes that need to be made, after which Banks would need to sign it. On October 25, 2016, Augustus emailed Banks promising that the bankruptcy case would filed the second week of November. However, the second case would not be filed until some four months later, on March 28, 2017.

On November 8, 2016, Banks called UpRight yet again to complain. The UpRight representative stated the following:

UpRight: Yeah, okay, you just need to contact Andrea Augustus if you have any questions about your case. I do see that you're all filed. That's obviously a good thing, but if you have any questions, you have to contact the attorney that filed your case. UST Ex. 34, pgs. 2-3.

---

[11] Credit counseling certificates expire after 180 days. 11 U.S.C. § 109(h).

The Court again notes that, at that time, Banks did not have an active bankruptcy case.  UpRight promised to email Augustus and have her contact Banks.  The UpRight representative stated that the dismissal of the first case was because "there were some issues with not being able to sign electronic filing in a timely manner."  As usual, this was a gross misrepresentation of why Banks' first case was dismissed.

On January 3, 2017, Banks again called UpRight.  She continues to complain to UpRight.  The UpRight representative assured Banks that the case had been filed:

> UpRight: Yeah, your case was filed already in September, ma'am.  You had your court date on  -- your case was filed already.  It was filed in June.  You had your Court date in September, so right now you're just waiting for your discharge, ma'am.  You'll get the discharge – UST Ex. 35, pg. 3.

Given what had already occurred, UpRight's ignorance here is astonishing.  Banks attempted to explain that the first case had been dismissed and a new case had not been filed.  The representative stated "[w]ell, she did refile it, ma'am."  The representative later retracted this assertion.  Again, UpRight promised to email Augustus and "include a manager from our partner relations department."  Not surprisingly, the phone call generated no response from UpRight.

On January 13, 2017, Banks sent a text message to Augustus stating "[p]lease call me ASP (sic), need to know where you are with my case."  Augustus failed to respond.  On January 24, 2017, Banks again called UpRight and spoke to an individual named Karen.  Banks again complains about the status of her case and the fact that Augustus did not respond to her text message.  Karen indicated she could see reports of Banks' previous calls to UpRight.  Karen stated the following:

> UpRight:  Right, yeah, we have spoken before.  This is – yeah, I see notes every – you know, like all through October and November, so I know this – this has been like a long, big issue.  So, Lillie, again I – you know, because – you know, there's nothing that can be resolved with this conversation alone, so let me go ahead and – and send the email to partner relations, and I'll be following back up with you with

25

more information on Thursday.  I'm putting you on my – my calendar if not before then.  UST Ex. 36, pgs. 8-9.

Based on the information in the record, the Court can only conclude that the "partner relations" department does very little, and is negligent at the very least.  There are multiple instances when UpRight representatives have promised to involve "partner relations."  However, there were never any results.

On March 6, 2017, Denise Alcauther (hereinafter "Alcauther") at UpRight emailed Augustus about Banks.  That email stated the following:

> Client listed below called in this morning stating that her case was supposed to be refiled.  Can you please reach out to her at your earliest convenience.  Please let me know if you need anything on my end.  Respondents Ex. 28.

The record does not show that August responded to this email.  There are no documented conversations or emails between Banks and Augustus from the date of the Alcauther email until Banks' second case was filed.

Banks' second bankruptcy case (the instant case) was filed on March 28, 2017.  However, the Court notes that the petition in this case is identical to the first petition.  Banks did not review it or sign it.  The petition falsely represents that it has been signed by Banks.  It is clear Augustus filed the exact same case without determining whether there were any changed circumstances.  By filing the petition and schedules without Banks' actual "wet" signatures, Augustus violated the rules for the electronic filing of documents and pleadings in this district pursuant to the Administrative Procedures for the U.S. Bankruptcy Court for the Western District of Louisiana ("Administrative Procedures"), last amended March 18, 2014.  Augustus falsely indicated Banks had signed the documents by indicating a signature with a "/s/" before Banks' name.  This representation was false.

26

On April 3, 2017, Banks completed her personal financial management course required for a discharge. She forwarded the certificate to Augustus, who never filed it. On May 5, 2017, Banks appeared for her first § 341 meeting of creditors. Augustus failed to attend that meeting.

The CM/ECF docket for this case at the time of the hearing in this matter showed Andrea Augustus as the attorney of record. UpRight was not listed on the docket. Augustus's physical address at all times pertinent to this matter was her residence. Augustus testified that she did not meet with clients in her home, instead meeting with them in offices she maintained. However, she could not provide the Court with the address of any office she claimed to maintain during time when Banks' bankruptcy cases were pending. The Court finds that she did not maintain an office during this time, and UpRight misrepresented this fact to Banks. Even if Augustus had maintained an office, her location in New Orleans made it all but impossible for Banks to meet with her.

These facts lead the Court to conclude that Augustus never had any intention of attending Banks' meeting of creditors. Augustus was clearly aware of the meeting date and time as she had sent an email to UpRight confirming it. On May 5, 2017, Augustus emailed UpRight and Banks at 2:57 p.m. that she was unable to attend the first meeting of creditors, even though that meeting had already taken place at 10:00 a.m. She stated that a "proper motion requesting an extension arising from extenuating circumstance will be filed before end by end (sic) of day Monday." Respondents Ex. 31. No such motion was filed. The Court finds that Augustus never intended to attend the meeting given her distance from Shreveport and the travel time that would have been required.

The Partnership Agreement between Augustus and UpRight set the rate of compensation for Banks' Chapter 7 case. Augustus was to receive 20% of all earned fees, assuming she performed certain work, plus 13% for attending the first meeting of creditors. Banks paid UpRight

27

$1350, so Augustus could have earned $175.50 for traveling from New Orleans to Shreveport for the meeting of creditors. Assuming she performed certain work and attended the meeting of creditors, Augustus could have earned a total of $445.50 for representing Banks. The round trip drive time between New Orleans and Shreveport is at least 10 hours. Further, there are no direct flights between the cities. Augustus's excuse that she was ill and could not attend the first meeting of creditors is not credible. The Court finds that she did not plan to attend the meeting given the low rate of compensation compared with the time and cost it would have taken to attend.

On May 11, 2017, Banks' second Chapter 7 case was dismissed for failure to comply with 11 U.S.C. § 521. Augustus had failed to file required employee income records, a declaration of electronic filing, a picture ID card, and Banks' Social Security card.[12] Augustus and UpRight took no further action on behalf of Banks to vacate the dismissal order or correct the Augustus's failure to file the required documents. On May 17, 2017, the UST sought to vacate the dismissal order and to take the Rule 2004 examination of Banks. Both motions were granted. Thereafter, on September 26, 2017, the UST filed the instant motion. The UST is seeking UpRight and Augustus disgorge all fees collected from Banks. The UST also requests this Court grant such other relief appropriate to deter this conduct in the future. In response, UpRight issued Banks a refund of $1,685.00, representing the attorney's fees and filing fee Banks had paid.

Upright Law, LLC is not a typical law firm. It consists of Chicago based Law Solutions Chicago, LLC, (hereinafter "Law Solutions"), an Illinois limited liability company licensed to do business in Louisiana as UpRight Law LLC. The firm engages "partner" attorneys located throughout the country. The nature of UpRight's consumer bankruptcy practice was outside the scope of the hearing in this matter. However, the evidence shows UpRight refers to itself as a

---

[12] The picture ID and Social Security card are required by Local Bankruptcy Rule 1002-1.

national law firm. UpRight does not maintain an office in the Western District of Louisiana. Instead, it engages "partners" licensed to practice law in the jurisdiction and then solicits consumer bankruptcy business over the internet.

UpRight appears to be nothing more than a referral service. It solicits clients and then refers them to local attorneys. The local attorneys, who UpRight calls "partners," file consumer bankruptcy cases for those clients after they are referred. In many instances, these "partner" attorneys maintain their own independent practices in which they often engage in consumer bankruptcy work. It appears "partners" are not full time UpRight employees.

Augustus, who "partnered" with UpRight to handle Banks' consumer bankruptcy, entered into her Partnership Agreement with Law Solutions on December 17, 2015. However, as the Court has already discussed, this partnership appears to be for the purpose of client referral only. This agreement allows Law Solutions to collect a referral fee for signing up bankruptcy clients and then referring them to so called "partner" attorneys such as Augustus.

## LEGAL ANALYSIS

The scope of the professional negligence on the part of Augustus and UpRight in the handling of Banks' Chapter 7 case is substantial. Over a period of more than two years, they have continuously violated the Louisiana Rules of Professional Conduct. These violations are noted below:

Rule 1.1 Competence:

(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Augustus and UpRight have failed to competently represent Banks in her Chapter 7 case. Banks' case should have been simple; in fact, UpRight has admitted as much. However, in the two years Banks has interacted with Augustus and UpRight, all she has achieved is two dismissed bankruptcy

cases. Due to lack of legal knowledge, skill, thoroughness, preparation, and general negligence on the part of Augustus and UpRight, Banks has still not received a discharge.

Rule 1.3 Diligence:

A lawyer shall act with reasonable diligence and promptness in representing a client.

Banks' Chapter 7 case should have taken no more than five months. However, over two years later, her case remains unresolved. This is due entirely to UpRight and Augustus. The Court has never seen such a lack of diligence in any Chapter 7 proceeding. Phone calls were constantly not returned. There was unnecessary delay. There were false promises. All fairly describe Upright's and Augustus's representation of Banks.

Rule 1.4 Communication:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter;

(4) promptly comply with reasonable requests for information; and

UpRight and Augustus never kept Banks appropriately informed of the status of her case. Augustus repeatedly failed to communicate with Banks in violation of the Louisiana Rules of Professional Conduct. Banks was often unaware of what was happening in her bankruptcy cases. Further, UpRight representative had an appalling lack of knowledge regarding what was occurring in these two bankruptcy cases. While Banks was always able to communicate with representatives in Chicago, those representatives either negligently or intentionally gave her the wrong information about her cases consistently. Still further, UpRight's failure to take corrective action

30

as promised, including returning Banks' phone calls, as well as giving her false information, leads the Court to conclude that they failed to reasonably consult with their client.

Rule 1.5 Fees:

(f) Payment of fees in advance of services shall be subject to the following rules:

(5) When the client pays the lawyer a fixed fee, a minimum fee or a fee drawn from an advanced deposit, and a fee dispute arises between the lawyer and the client, either during the course of the representation or at the termination of the representation, the lawyer shall immediately refund to the client the unearned portion of such fee, if any. If the lawyer and the client disagree on the unearned portion of such fee, the lawyer shall immediately refund to the client the amount, if any, that they agree has not been earned, and the lawyer shall deposit into a trust account an amount representing the portion reasonably in dispute. The lawyer shall hold such disputed funds in trust until the dispute is resolved, but the lawyer shall not do so to coerce the client into accepting the lawyer's contentions. As to any fee dispute, the lawyer should suggest a means for prompt resolution such as mediation or arbitration, including arbitration with the Louisiana State Bar Association Fee Dispute Program.

Banks often came close to requesting UpRight provide a refund of her fixed fee; however, the Court notes Banks never explicitly requested a refund. She did frequently reference the fees she had paid. If Banks had overtly requested a refund, then the Louisiana Rules of Professional Conduct would have required UpRight to immediately refund the unearned portion of such fee. Regardless, the Court finds that UpRight did violate this rule. An UpRight representative said the following to Banks: "on our end – on our end as far as, you know, refunds go, which is what I think you're about to (incomprehensible), the work's completed, like the case is filed, the attorney fees are done, credit counseling all that so we couldn't offer a refund." The representative was clearly attempting to avoid a refund request. Rule 1.5 would have required UpRight to immediately refund Banks the unearned portion of the fixed fee if a fee dispute had arisen. The UpRight representative was obviously misrepresenting UpRight's obligations under the Louisiana Rules of Professional Conduct. UpRight misrepresented its professional obligation to provide a

31

refund. The Court holds that any future fixed fee agreement between UpRight and any Louisiana client must include a disclosure of its requirement to provide a refund under the Rules of Professional Conduct. Further, UpRight may not make statements that lead clients or potential clients to believe that that have no right to a refund.

RULE 5.1. Responsibilities of Partners

(a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

(c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

UpRight's supervision of Augustus was totally inadequate. UpRight has various supervisory lawyers who were expected to ensure client satisfaction. On multiple occasions, UpRight representatives promised Banks that her complaints would be escalated. The supervisory lawyers were either unable or unwilling to address the issues in Banks' case. By their lack of action, the managing attorneys in the Chicago office ratified Augustus's conduct. Still further, with regard to Augustus, the managing partners had supervisory authority over her practice. Many of the errors and negligence in this case could have been avoided if they had taken action.

32

11 U.S.C. § 528 requires bankruptcy attorneys execute a written contract and to provide such contract to their clients. This Court has already noted that Banks' retainer agreement with UpRight was signed by a lawyer not licensed in Louisiana. In fact, the lawyer did not even see it or physically sign it. Cynthia Tannert's electronic signature is affixed to the retainer agreement by the notation of a /s/Cynthia Tannert. Tannert a "partner" with UpRight, has given permission for UpRight to sign her name to these contracts without notice. This does not comply with the requirements of the Bankruptcy Code. Banks never had a written contract with UpRight executed by a Louisiana licensed lawyer.

Pursuant to 11 U.S.C. § 329 and Fed. R. Bankr. P. Rule 2017, disgorgement in this case is appropriate. Section 329(b)(2) of the Bankruptcy Code provides that a court may order disgorgement of fees if attorney compensation exceeds the reasonable value of the services provided. Further, Bankruptcy Rule 2017 provides the following: "[o]n motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code…to an attorney for services rendered or to be rendered is excessive." The Court finds no value in the services UpRight provided to Banks. To the contrary, UpRight's actions harmed Banks by causing her to file two bankruptcies instead of one, and allowing a judgment to be entered against Banks when such judgment could have been avoided. In both bankruptcy cases, Augustus failed to submit basic required documents t, despite Banks having provided her those same documents. When the proceedings were dismissed, Augustus and UpRight failed to correct the mistakes in either proceeding and failed to communicate with Banks for months at a time. In this case, Augustus filed identical schedules and

33

statements to those filed in the first case, with no updated financial information and without Banks having reviewed or signed them.

While Augustus bears responsibility for her failures, UpRight took no effective action to aid Banks. UpRight took no action even though Banks had apprised them constantly of the issues in her case. The contract UpRight provided Banks stated that "[c]lient retains Firm, (and not any specific attorney/staff member) to represent Client for Chapter 7 Bankruptcy Services." This contract indicates that UpRight should have been responsible for proper representation.

Disgorgement is appropriate under 11 U.S.C. § 526(c)(1). That section provides that "any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of [11 U.S.C. §§ 526, 527, or 528] shall be void and may not be enforced…other than [by] such assisted person." Under 11 U.S.C. § 528, a debt relief agency must "execute a written contract" with a client not less than five days after first providing bankruptcy assistance services and provide the assisted person with a copy of the fully executed and completed contract. Here, Banks' contract bears the electronic signature of Cynthia Tannert. Ms. Tannert is a Tennessee attorney who is not licensed to practice in Louisiana and and has never had any contact with Banks and never physically signed any contract with her. Thus, the signature on the Banks contract is false, and the contract is fraudulent. Even assuming Ms. Tannert had actually signed the contract, she is not licensed to practice law in Louisiana and had no ability to ensure UpRight followed through on its agreement to serve Banks. Moreover, UpRight and Augustus never executed a contract with Banks, despite Augustus having filed her two bankruptcy cases. As a result, no one from UpRight ever executed a contract with Banks. UpRight failed to provide Banks a properly executed copy of a written contract between them. This is in violation

34

of 11 U.S.C. §§ 528(a)(1) and (2), so the contract is void and UpRight must disgorge all fees collected as provided by 11 U.S.C. § 526(c)(1).

Relief pursuant to 11 U.S.C. §§ 526(c)(5) and 105 is also appropriate. Section 526(c)(5) provides that upon a finding that "a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may…enjoin the violation of such section;…or…impose an appropriate civil penalty against such person." Section 526(a)(1) provides the following:

> (a) A debt relief agency shall not –
> (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title: …
> (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;
> (3) misrepresent to any assisted person or prospective assisted person, directly, or indirectly, affirmatively or by material omission, with respect to –
> (A) the services that such agency will provide to such person: or
> (B) the benefits and risks that may result if such person becomes a debtor
> in a case under this title...

In this case, UpRight promised to provide Banks an array of bankruptcy services. UpRight has repeatedly failed to provide those services or misrepresented those services. UpRight's continued failure to provide Banks with bankruptcy services after numerous requests for help amounts to an intentional violation of 11 U.S.C. § 526(a)(1). UpRight's apparent disregard seems to reflect a business model in which this Chicago based corporation is primarily a marketer of legal services, not a provider of them. UpRight has never provided Banks any real service, beyond the detrimental step of referring her to Augustus. Violations of 11 U.S.C. § 526(a) are actionable under 11 U.S.C. § 526(c)(5), which provides that the Court may enjoin the violation of such section or impose an appropriate civil penalty.

35

The UST and UpRight have agreed to the following sanctions for UpRight:

(a.) Disgorging of all fees paid by Banks.

(b.) Refunding $30 representing sums Banks paid for credit counseling.

(c.) A civil penalty in the amount of $5,000.00 paid to the United States Treasury.

## CONCLUSION

The Court approves the sanctions agreement between the UST and UpRight. The Court finds that UpRight has previously disgorged to Banks all fees that she paid. However, the Court will also impose the following sanctions and requirements.

**IT IS ORDERED** that UpRight refund to Banks the sum of $30.00 no later than 14 days after this order is entered. This represents the sums Banks paid for credit counseling.

**IT IS FURTHER ORDERED** that UpRight pay a civil penalty of $5,000.00 payable to the United States Treasury c/o Richard H. Drew, Office of the United States Trustee, 300 Fannin St. Suite 3196, Shreveport, Louisiana 71101. UpRight shall make this payment no later than 14 days after this order is entered.

**IT IS FURTHER ORDERED** that, pursuant to Local Civil Rule LR83.2.10, the Court suspends attorney Andrea Augustus from the practice of law in the United States Bankruptcy Court for the Western District of Louisiana effective on the date this order is entered for a period of 90 days. The Court stresses this suspension is appropriate due to her negligent handling of Banks' case and her violations of the Louisiana Code of Professional Responsibility.

**IT IS FURTHER ORDERED** that, pursuant to Local Civil Rule LR83.2.10, the Court suspends UpRight Law, LLC from filing any bankruptcy case in the Western District of Louisiana effective on the date this order is entered for a period of 90 days. This suspension includes any of UpRight's partner attorneys. The Court stresses this suspension is appropriate due to UpRight's

36

negligence in representing Banks, its failure to adequately supervise Augustus, and its violations of the Louisiana Code of Professional Responsibility. However, partner attorneys who maintain separate legal practices may continue to file bankruptcy cases for those clients not contracted with or represented by UpRight. Partner attorneys may also participate in any bankruptcy cases filed by UpRight prior to the entry of this order.

**IT IS FURTHER ORDERED** that Andrea Augustus's electronic filing privileges are suspended in all divisions of the United States Bankruptcy Court for the Western District of Louisiana. This suspension is due to her violations of the rules for the electronic filing of documents and pleadings in this district pursuant to the Administrative Procedures for the U.S. Bankruptcy Court for the Western District of Louisiana ("Administrative Procedures"), last amended March 18, 2014. By signing Banks' name to a bankruptcy petition and schedules she did not sign, Augustus is in violation of these rules. Augustus may petition this Court for reinstatement of her electronic filing privileges after she completes fifteen hours of bankruptcy specific continuing legal education.

**IT IS FURTHER ORDERED** that UpRight Law, LLC may not accept any payment from any Western District of Louisiana residents who have not had a thorough and adequate consultation with an attorney that is licensed to practice in this District and is able to represent them.

**IT IS FURTHER ORDERED** that UpRight Law, LLC contracts or retainer agreements must conform to Louisiana Rule of Professional Conduct 1.5(f)(5). All contracts between UpRight and residents of the Western District of Louisiana must contain the following language in bold, 12 point type:

**The Louisiana Rules of Professional Conduct require that when a client pays a lawyer a fixed fee, a minimum fee or a fee drawn from an advanced deposit,**

37

and a fee dispute arises between the lawyer and the client, either during the course of the representation or at the termination of the representation, the lawyer shall immediately refund to the client the unearned portion of such fee, if any. If the lawyer and the client disagree on the unearned portion of such fee, the lawyer shall immediately refund to the client the amount, if any, that they agree has not been earned, and the lawyer shall deposit into a trust account an amount representing the portion reasonably in dispute. The lawyer shall hold such disputed funds in trust until the dispute is resolved, but the lawyer shall not do so to coerce the client into accepting the lawyer's contentions. As to any fee dispute, the lawyer should suggest a means for prompt resolution such as mediation or arbitration, including arbitration with the Louisiana State Bar Association Fee Dispute Program.

**IT IS FURTHER ORDERED** that the interim relief this Court previously entered (ECF No. 35) is made permanent. **ACCORDINGLY, IT IS ORDERED** that attorneys acting on behalf of UpRight Law LLC and its affiliates are immediately prohibited from filing any document electronically signed by a client (i.e., using the /s/ notation for a signature). All documents UpRight Law LLC and its partner attorney's file in the Western District of Louisiana containing a client signature must have a scanned original signature. This order applies to all bankruptcy cases filed by UpRight Law LLC and its affiliates in the Western District of Louisiana.

**IT IS FURTHER ORDERED** that every employment contract for debt relief services between UpRight Law LLC and its clients must contain the original "wet" signatures of both the client and the UpRight Law LLC attorney licensed in the Western District of Louisiana. The attorney who executes that contract shall be designated as the attorney in charge of that case. Further, UpRight Law LLC and its affiliates may not accept a retainer from any client before an employment contract is executed. This order applies with respect to UpRight Law LLC and its affiliates and any of their prospective clients residing in or anticipating filing bankruptcy in the Western District of Louisiana.

**IT IS FURTHER ORDERED** that every attorney affiliated with UpRight Law LLC and its affiliates filing a pleading within the Western District of Louisiana on behalf of those entities

38

must contact the clerk of court and update their CM/ECF account or create a duplicate account so that the docket in each case accurately reflects their firm's name as UpRight Law LLC.

###